The next case on the calendar is United States v. Hamlett. Good morning, and may it please the Court. My name is Jameisa Drake, and I represent Christopher Hamlett, and with the Court's permission, I've requested two minutes of rebuttal. The Government, through its two key witnesses, Smith and Doe, accused Mr. Hamlett of absolutely deplorable behavior, and I in no way mean to diminish the seriousness of the accusation. Without question, the most powerful part of the Government's case was the presentation of the testimony of these two young women. And so, as the District Court acknowledged, their truthfulness was of paramount importance in this case. Now the law prohibits a party from calling one witness to testify and vouch for the credibility of another witness. That's why, for example, in Nimley, it was error to call an expert witness to testify that the police witnesses in that case were credible and to offer a series of rationales as to why that was so. But by comparison, the law allows, sometimes, this Court has even held it demands, that defense counsel challenge the reliability of witness testimony, and expert witness testimony on that point is permissible. It is permissible, for example, to call an expert witness to testify about why a person's physical condition, say traumatic brain injury, or a person's mental health condition, say schizophrenia, impairs their ability to form memory or to recall those memories or to be truthful in that regard, their capacity for truthfulness. Here, Mr. Hamlet wanted to call an expert witness to testify about how the characteristics that people with mental health diagnoses that Smith and Doe have are exhibited as a class. Could I ask you a question about that, Ms. Drake? Is this, are these diagnoses that these people have or that they had? They are, I hesitate because I'm aware that there is some literature that one is never truly cured of a mental health diagnosis, certainly not without the treatment and care of a physician. On this record, we know that 18 months prior to the events alleged in this case, they had these diagnoses and... Again, when you say they had the diagnosis, I want to be clear on exactly what we're talking about here because we're talking about something that strikes me as at least somewhat less usual than you suggest. Most of the cases talk about, mental health cases talk about things like delusions and things that would affect the person's ability to form an accurate impression of what's happening, as opposed to a diagnosis that is intended to suggest that the person lies. Now, you know, and we talk, I think the cases talk about when this comes up, not necessarily for expert testimony, but even for cross-examination. We ask about the nature of the psychological problem, the temporal recency or remoteness of the problem, and whether the person suffered from the problem at the time of the events being testified to. Here we have the somewhat unusual circumstance of records that record that somebody made some diagnosis, and it's not the person who's writing down the record apparently, that there's some reference to this. And then we're talking about an expert who looked at the entire history compiled in a file of a mental health practitioner, but it's the file of something like the Agency for Child Services, and then diagnoses the person, and then says that that diagnosis means you shouldn't believe what this person says. Is that a fair summary of what the expert was going to do? And on what basis, or am I missing something? Your Honor, there's a number of things I'd want to unpack there. To your very last point, because it's critical, and it's a point that defense trial counsel emphasized repeatedly, the idea was not to call this expert witness to offer the ultimate conclusion about whether these women should be believed or whether they were being truthful. The idea was that the, and correct me if I'm misunderstanding, but I want to make sure I understand, the idea was that the expert would testify a person suffering from this condition, a person with this diagnosis, would have the following symptoms or could have the following symptoms. Is that correct? That's correct. That's correct. And that feeds to another point of your question I wanted to touch on, which talks about hallucinations or delusions. The government mentions that in its brief. Of course, expert testimony in this regard is not so limited, which I think is easily illustrated by someone who suffers from a physical condition, like traumatic brain injury. They may not experience hallucinations or delusions, and yet may still have difficulty with memory formation and with recall. Here, which is to say. But that doesn't make them dishonest. Certainly. But it does go to the reliability of their testimony, which is an important point distinguishing credibility and reliability. Can you address, Judge Lynch alluded to these DCF records. They were incomplete, I understand. They were often reporting what social workers said, assuming that that's what the expert was going to testify to, a person with this diagnosis could display these symptoms. Why was there an adequate foundation in these records to introduce that expert testimony to the jury? Yes. Thank you for that question. That was the other part of your point. The defense collected DCF records, some of which contained the sort of narrative reports that the government suggests are not sufficiently reliable. There is contained also within these records, though, a document from a psychiatrist that says that she saw one of the young women and she gives four diagnoses. There was, in our view, therefore at least a legitimate basis for asking the women themselves the very two limited questions that defense counsel proposed. Are you aware of whether you have a mental health diagnosis and how you've been taking your prescribed medication? Certainly the prescribed medication question is a routine question. We ask criminal defendants that all the time before we accept guilty pleas in criminal cases. But let me make sure I understand where this is going. The best your expert was going to be able to do would be to testify that it could, this diagnosis could result in certain things bearing on truthfulness, right? That's correct. Which meant that it could not as well. In those circumstances, what was the error for the judge to exclude testimony that had that degree of uncertainty about it, particularly in a case in which there were lots, there was lots of evidence admitted that went to credibility. The women's drug use, their alcohol use, their past lies, the fact that the government was supporting them, all these bunch of credibility, why did the district judge abuse his discretion in not allowing a could affect it, could not have affected type of opinion? I see my light is on, if I may. My principal response to that is that it both highlights the way in which this expert witness was not trying to do what the district court was worried about, which was to vouch for their credibility. But also, it would just simply go to the weight, so the jurors could hear, people who have these mental health diagnoses, as a class, have these characteristics, not all of them do. Right. So to that extent, why isn't it within the judge's discretion, you know, he's a gatekeeper on expert testimony to decide that this is not sufficiently probative and possibly prejudicial to get into this kind of speculative, almost speculative testimony? Well, and this feeds into my response about your harmlessness question. It was, in our view, terribly probative. I'm sorry. It was, in our view, terribly probative for the reasons that I set out at the beginning of my remarks. The believability, the truthfulness of these two women was the crux of the case. The government had evidence, what I'm calling the electronic footprint evidence in this case, but there were weaknesses with that. Right. But here you had evidence that they had lied in the past, so their capacity to lie was not in dispute, neither was their motive. You had the evidence about the government's support and all of that. I mean, I'm just not sure what more this would add. That's the difficulty I'm having. And I suppose I have a two-part response. The first is, I think any trial attorney would say that any evidence that goes to credibility is not too much, that credibility, particularly of these important witnesses, is the central issue of the case. And so if you have good admissible evidence that pertains to their reliability and their truthfulness, that that shouldn't be kept out. It's also somewhat illogical to say that in a case where the jurors, it would seem, ultimately believed these women, as reflected in their verdict, that evidence that goes to whether they had the capacity for reliability and truthfulness would somehow have just been cumulative of other evidence. And just to go back to the motive, why would they lie about whether it was this fellow whose cell phone was used to take the pictures and to send the texts and so on, rather than one of the other fellows who, there was some evidence, may have had communal access to one or another of these devices? What's that motive? So I certainly was not privy to the conversations that the investigators in this case had with the women themselves. However, the record is filled with evidence to suggest that these women approached their testimony in this case in a very transactional way. They were willing to testify in exchange for favors from the government. So to the extent that it was the government's goal to get... reason to go after Mr. Hamlet than any of these other fellows, if they were the ones who... If these women had said, it would have been a harder case, I guess, for the government without all of the electronic footprint evidence. But if they said, well, I don't know whose cell phone it was, but I know that it was Smith or Jones rather than Hamlet who took those pictures of me, the government would have said, no, no, no, you have to go for Hamlet? Well, the indictment against Mr. Hamlet and the fact that they were pursuing a criminal prosecution... Yeah, but where did that come from? Why are they pursuing that? Didn't the women tell that in the first place? And then the question was, are you willing to testify to that or not? And they said, hey, how much, what's in it for me? Well, in fact, I don't believe it, again, I don't want to overspeak because this is not information that I'm necessarily privy to, but it appears from the record that at least one of the women was very reluctant to say that Mr. Hamlet was the perpetrator and was willing... I think that's all I feel comfortable saying. Okay, fair enough. I understand. I understand.  May it please the court. My name is Nancy Gifford. I represent the government on this appeal, and I also represented the government in the trial court. One thing I guess I want to start with is the discussion about these being two key witnesses. While certainly they were key witnesses, they were not uncorroborated witnesses. And as this court just had a discussion about the electronic evidence, that's important. There was a lot of electronic evidence. Can I just ask, we can hear you, but I would just move the microphone a little bit closer just to make sure we don't miss some words. Thank you. And the electronic evidence included the back page advertisements, which included email addresses and the defendant's name, his phone number used to post those ads, which are linked to the defendant's subscribed phone number. And I understand the argument is, who puts that phone in the defendant's hand? Who can point to the defendant being the person behind the keyboard? But the suggestion that that relied only on Jane Doe and Mary Smith is not accurate. There were two adult female victims who testified during trial. Tashiona Stevenson testified on numerous issues, including the manner in which she was trafficked by Mr. Hamlet. He promoted her in prostitution in a similar manner in which Jane Doe and Mary Smith were promoted. But significantly, she also personally observed Jane Doe being trafficked by Hamlet. As to Mary Smith, she testified that she, I'm sorry, as to Chelsea Lorette, she testified that her practice with Mr. Hamlet was that she sent him images of herself or of others that she found on the internet for him to post on her behalf when promoting her in prostitution. Those advertisements were offered into evidence during trial, and those advertisements not only showed images that Chelsea Lorette said she gave to Mr. Hamlet, but also included in that same advertisement pictures of Jane Doe and Mary Smith. So it was not simply documents, electronic evidence, and Jane Doe and Mary Smith, which I submit would be sufficient, but we also had these two adult witnesses who could put Mr. Hamlet behind the keyboard, holding the phone, and the like. I just wanted to turn quickly, if the court would like, to the Sasso factors. We talked a little bit about the three prongs here, which is first that there was a proper foundation, and I think it's important to look at what the district court said, which is that these DCF records were not medical records. What the district court called them was subjective mental health diagnoses by untrained caseworkers, and that's at A115. I think that's important, because that's giving the court's assessment of the reliability of these documents. They were not your traditional medical record. As to the second factor was the temporal remoteness, and as was discussed here, the key exhibit that the defense relied on was Exhibit II. That was one document that was, in fact, signed by a psychiatrist, but it predated our charge time period by 18 months, so there was a remoteness to it. In addition, there's the contradictory nature of these reports or these DCF caseworker notes, and one report, Jane Doe has bipolar, and the next report, she does not, and that's highlighted out in our brief, I believe, at page 29, the contradictory nature of some of these reports. I can continue on as to the expert report. Again, the court properly weighed as to Rule 702 that it had concerns with the methodology and the expert would be using. That relates back to the unreliability of these DCF records. In addition, it also engaged in a 403 balancing analysis and found that— Could you just address, and it's discussed in both briefs, but the DCF records came in late, so the defense counsel is hampered by getting incomplete records shortly before trial, and is that something that should concern us in our evaluation of how this proceeded at each stage during the trial? Thank you, Your Honor. It's important to note that in this case, the defendant from the beginning was insistent on a speedy trial, and the government made every effort to ensure he got that speedy trial. We, in fact, had one jury selection early on that we had an insufficient number of jurors. It was quickly then transferred to another judge who could fit this in his schedule sooner, and that judge put us down in October. So we picked up Mr. Hamlet by criminal complaint in February of 2018, and the trial happened in October of 2018. All along, there was discussions about these DCF records, and the parties agreed on September 26th—that's at government—the sealed appendix at 6 to a rolling DCF disclosure plan. So every—the judge would be looking through these voluminous records, and then in a rolling manner providing us with these records, and we would give 48 hours to review and identify any of those records that would—the party would offer, and we would provide our objections within 48 hours. The parties agreed to this because it was the best way to move forward with Mr. Hamlet's request for a speedy trial. This was reiterated on October 3rd—that's at government sealed appendix 49—and even though the district court identified early on that it had concerns about how these DCF records could be used, and that's—the court noted that in September 26th, again at page 6 of the sealed appendix, and again at page 26 and 27 on October 3rd, expressing any concern about using these records for employment. Early on, the defense was aware that these records could not or may not be able to be used in any significant way for an expert or for cross-examination. Thank you. Thank you, Your Honor. We simply ask for the court to affirm the judgment of the district court. Thank you. We'll hear rebuttal. Thank you very much, and I'll be brief. I'll begin where my sister began by talking about the testimony of the adult women in this case. There, too, the jurors had reason to doubt what they were saying. One of the women testified that she never met a Smith or Doe. The jurors also heard testimony about the other adult women that Detective Lewis, who was investigating the case, doubted whether Doe was accurate in her description of her relationship with Stephenson, this other adult woman. And she had open charges at the time she was testifying in this case. I think the only other point that I would like to make has to do with foundation for asking the questions to begin with and whether there was a sufficient foundation laid here. Our view is this argument is circular. If the DCF records are not to be trusted as definitive diagnoses, then the next best way to go about getting that information is to ask the women themselves. Defense counsel made very clear that she would, her examination would be limited to the answer she received from these women, but even then, she was disallowed asking those questions. But isn't the problem that it is, if not circular, at least linked? In other words, if you ask a witness, did you ever have a, were you ever aware of any mental health diagnosis? Well, she might say, yes, and say, give a name of a syndrome. Now, first of all, there's going to be a problem, right? The person might have many diagnoses that show up in these records, not all of which the person is privy to, but let's forget that. She says, bipolar. And were you prescribed medication for that? Yes. Do you take it? Mostly. Sometimes. I haven't taken it for a while. Now what? Without an expert to testify as to the significance of that, it just hangs there as a kind of badge of infamy without any actual indication of what it means or doesn't mean. So then you'd need to have somebody come in and talk about that, wouldn't you? And that's kind of the problem. You would. So if it's just that, it's not anything, but it's a package. That's correct. I would agree with that completely, that if you do not, if the trial court was unwilling to accept the DCF records themselves as failing to establish an adequate foundation for the expert, then it would have to be the testimony of the women themselves. But without both the DCF records or the testimony from the women. But it's somewhat problematic, is it not, if, as Judge Radji pointed out, the problem is that the strongest the person, the expert could say about the relevance of the totality of all of the diagnoses is that some people with this diagnosis don't always tell the truth. Well, that's true. But I would suggest to this court that it also wouldn't be different than an expert witness who would be called to testify and say, for example, someone who has had injury to this portion of their brain is likely to respond, fill in the blank. But maybe not. But maybe so. And the jurors could then make whatever use they want of that. That is not to say, though, that because of the equivocal nature of that testimony, it wouldn't have been beneficial to the defense and that the deprivation of it was not, was harmless. Well, but doesn't it also make it something of a case-by-case determination for a judge to make as to whether on the totality of the circumstances of this case that is sufficiently probative to outweigh whatever prejudicial value there is and sufficiently reliable in view of the underlying foundation to be worth venturing into? It must be. But to the extent that the court, the district court, relied on reasoning like mental health diagnoses, making public the fact that someone has a mental health diagnosis is prejudicial to them. Well, isn't that one of the factors, though, that goes into the discussion? You weigh how probative is this versus what are the problems with it, and each of those is subject to not a precise answer. And then you weigh them against each other, and that's also not subject to a precise answer. Certainly. The way I would finish that sentence is to say it's not dispositive. It's not dispositive. True. I'm a little concerned that the ultimate subject here, too, is not a diagnosis that, well, this impairs sight or this, but that this, people who have this diagnosis might lie. Well, people who are sentient might lie. So to that extent, I'm not sure that this doesn't come very close to intruding on the that is equivocal and is not based on any examination by the witness of these people. Why should we find that it's error to not allow that? Well, this Court has already said that if the diagnosis is schizophrenia, for example If the diagnosis is schizophrenia, then defense counsel will perform deficiently for failing to call an expert witness to explain to the jury. But not with respect to credibility. With respect to their capacity for truthfulness in the sense of their ability to accurately relate what they're saying happened. I would suggest that this But what you're talking about goes to their willful lying. The case you're talking about, by comparison, goes to their capacity to either perceive or recount or whatever. But now you're starting to talk about whether or not they would willfully lie. Not that they're somehow compelled to lie. Or am I missing something? Yes. Yes, John. I don't mean to convey that impression. It is one and the same. You have a, whether your mental health diagnosis is schizophrenia or one of the diagnoses that the DCF records and the treating psychiatrist suggested that these women have, both types of diagnoses carry with them characteristics that a class of people with that diagnosis exhibit. Yeah, but actually it kind of works the other way. You do an examination of somebody and you look at their history and you see that they lie a lot. And then you put a label on that, that that's part of, that is part of a syndrome. That adds up to something. But the underlying, even the psychiatrist or psychologist who makes that diagnosis is relying on the same kinds of things that a juror is going to rely on. And the question is, you know, did they, do they lie a lot? Not do they have something wrong in their brain or something wrong in their upbringing that makes them more likely to lie a lot. It's that we have this, you know, these diagnoses like, you know, antisocial personality disorder or something like that, that means this person committed a lot of crimes. There must be something going on there. You know, that's not, that doesn't make it, you know, that's very dangerous to start thinking that should be admitted as evidence to suggest that this person committed a crime on a particular occasion. And this is the flip side, the crime being perjured on the part of a witness. That's I think what's giving me pause is that we're not quite talking about the same thing as some of these other disorders that manifest in ways that bear on something other than, you know, basically they have a history of lying to their counselors and so on. I take it that kind of stuff came in, right? They were cross-examined about some of the behavior that they exhibited while they were in the custody of the DCF. And that's the same kind of stuff that the mental health practitioners are relying on when putting this particular label on them. No, I can't agree with that because the psychiatrist testified that she saw these women. She may have been relying on them. I'm sorry, I thought no one testified. I'm sorry, I misspoke. Right, the person who signed the report saw the people. Of course, of course that's true. And there may be other things that were characteristic. And there may be other things of these diagnoses that you or I would not perceive. That then the professional says, well, this is what we call this when somebody has a history of doing a lot of lying and various other things, you know, they're often anxious or something like that. Well, okay, we call that schizotypal personality disorder or something of the sort. But the thing about the lying is it's circular. It's not that there's something that the expert can point to that says this phenomenon makes them dishonest. It kind of works the other way. That their persistent dishonesty factored in with other things gives them a somewhat social diagnosis of this is the kind of personality we're dealing with. So I think maybe a way to try and succinctly answer that is if I were to testify as a witness and my mental health were not called into question, the government could probe my truthfulness by impeaching me with prior inconsistent statements, things of that nature, things that were done in this case. But if, for example, I am a defendant in a criminal case and I am testifying on my own behalf and saying, let's say I have an alibi defense, I'm not the perpetrator, the government should be allowed to say, well, you have a mental health diagnosis and people who are of that class exhibit characteristics like disassociation, blaming others, vindictiveness, treating relationships like contracts, all of the things in the proffer. And that is information that a lager would not know. They wouldn't know that one diagnosis carries with it a corresponding set of characteristics. And then the government would be able to use that as additional ammunition to say, well, not only do you know that the defendant's not truthful because she's been impeached with prior inconsistent statements, but also has this mental health diagnosis that makes it very unlikely that her testimony is reliable because it carries these characteristics. I bet the defense lawyer would object, and I'd be inclined to sustain it. Maybe it's a one-way ratchet, so maybe you don't want to make that argument. I take your point. I understand what you're saying. And I'll just very quickly say, in summation, I think there is a fine line between credibility and reliability. And in this case, I think that the testimony was on the reliability side and was not unduly prejudicial and would have been probative in this matter. Thank you very much. Thank you. Thank you, both. Thank you. Very well argued. I appreciate it on both sides. And we'll take the matter under advisory.